WILLIAM L. RUSSELL and GEORGE W. FELTER

*vs.*

T. IRVIN ZIMMERMAN.

*Right of way: obstruction; dwelling or store fronting on way;*
*injunction.  Condemnation of land: title by inquisition;*
*special agreements as to——; effect of——.*

An electric railway condemned from a large tract of land
a strip binding on an avenue from its intersection with a turn-
pike road; by agreement of the parties there was incorporated
in the condemnation proceedings (to be taken as part of them),
a provision that the railway should construct and maintain
crossings over its tracks for each *dwelling* that should be built
on the tract *fronting* on the avenue, for the benefit of the own-
ers of the land condemned, their heirs and assigns; subsequently
a corner lot of the tract on the turnpike, and running 120 feet
along the strip so condemned, was sold to Z. by the successor
in title to the tract; the deed reserved to the grantor, his heirs
and assigns, the right to use a strip of the land conveyed ten
feet wide along said avenue, as a sidewalk or footway.  Subse-
quently the railway removed its tracks from the said right of
way fifty feet binding on the lot adjacent to the turnpike
road, and deflected the tracks to those of a line running parallel
to the right of way, and by deed released the land so abandoned
to the successors in title of the land that had been condemned,
who in turn deeded such strip of the land to X.; X. claimed
the land in fee and proceeded to erect a building thereon; Z.
filed a bill for an injunction to restrain its erection on the
ground that it cut off the access, over the railroad tracks, to
the building he had erected on his property; and on appeal
from a decree of the lower Court granting the writ, it was *held,*
that the injunction should issue.      p. 392

The erection of the building on part of a right of way sepa-
rating the plaintiff's property from the avenue amounted to an

unauthorized obstruction in violation of an agreement relating thereto, and inconsistent with its purposes, in so far as it deprives the plaintiff of his property right, acquired thereunder, to cross said right of way in front of his building in reaching the avenue, and the erection of the building was enjoined.

p. 342

From the construction and use of the building, it must be considered as "fronting" on both the turnpike and the avenue.

p. 333

The fact that the building was used as a store and for other business purposes, does not prevent it being entitled to a crossing over the railway tracks, according to the provisions incorporated in the condemnation proceedings.                    p. 341

In condemnation proceedings, inquisition may take the place of a deed in conveying the interest and estate acquired by such proceedings, and the land condemned may be made subject to the terms and conditions imposed by agreement between the parties, and made part of the condemnation proceedings, and be binding on them and those claiming under them.     pp. 339, 340

The right of way along the avenue was conveyed, by the agreement and condemnation proceedings, to the owner of the land and her assignees, and the railway company could not be permitted to place upon the right of way any obstructions that would abridge or interfere with the exercise of such right.

p. 339

A court of equity has power to restrain the railway or its grantees from any attempt to violate the right.          p. 341

If a covenant, although not running with the land, is of a character to create a right and an equity in favor of the vendor or lessor and those claiming in his right as against those holding and occupying the land, a court of equity will assume jurisdiction and administer relief.                    p. 341

*Decided June 25th, 1913.*

Appeal from the Circuit Court of Baltimore County in Equity (BURKE, J.).

The facts are stated in the opinion of the Court.

The cause was argued before Boyd, C. J., Briscoe, Thomas, Pattison, Urner and Stockbridge, JJ.

*James F. Thrift* and *D. G. McIntosh* (with whom was *D. G. McIntosh, Jr.,* on the brief), for the appellant.

*Luban Sparks* and *T. Scott Offutt,* for the appellees.

Pattison, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court for Baltimore County enjoining and restraining the appellants, defendants below, from obstructing that part of a strip of land thirty feet in width, lying on the northwest side of Belvedere avenue, which abuts upon the lands of the appellee, T. Irvin Zimmerman, by the erection of a building or buildings thereon.

Belvedere avenue, of the width of sixty feet, was opened by the authorities of Baltimore County as public highway of said county about the year 1879, and after it had been opened the Baltimore Traction Company, a passenger railway, laid its two tracks on the northern portion of it between Park Heights avenue and Reisterstown turnpike.

In the year 1898 the Falls Road Electric Railway Company condemned for the construction, use and occupation of its railway a strip of ground thirty feet wide lying immediately northward of Belvedere avenue, extending from Park Heights avenue to Reisterstown turnpike, and upon this condemned strip of land laid its two tracks extending westwardly from Park Heights avenue to a point within a few feet of said turnpike.

At the time this land was condemned it formed a part of a tract or parcel of land situated northward of Belvedere avenue and eastward of Reisterstown turnpike that was owned by Mary J. Wamsley, wife of John S. Wamsley.

The aforesaid railway companies separately operated their lines until about the year 1898, when they consolidated under the name of the United Railways and Electric Company, at which time the extreme ends of the two tracks of the Falls Road and Electric Railway Company, near the turnpike, were deflected southward, running into the tracks on Belvedere avenue which were formerly owned by the Baltimore Traction Company and which thereafter crossed the turnpike.

The removal of these tracks, resulting from the deflection mentioned, left the extreme westward end of the right of way, for a distance of probably fifty feet or more, eastward from the turnpike, without any tracks upon it, and this portion of the right of way was not thereafter used by the railway company, except occasionally it would temporarily place thereon cross-ties or other material to be used in the repair of the road. It is this part of the right of way that the defendants are restrained and enjoined from obstructing by erecting thereon a building fronting on the turnpike, to be used as a bank building, as disclosed by their testimony.

All of the Wamsley tract or parcel of land not disposed of prior to the fifth day of September, 1906, became at such time the property of one Charles A. Hook, Jr., who, with his wife, on the 17th day of December, 1906, conveyed the same to James E. Ingram, Sr. By this conveyance to Ingram the reversionary interest formerly held by Mary J. Wamsley in the aforesaid strip of land, as well as in the northern half of Belvedere avenue as opened, passed from Hook to Ingram.

On the 6th day of March, 1907, James E. Ingram, Sr., and wife conveyed unto the appellee, T. Irvin Zimmerman, a part of the land so conveyed to Ingram by Hook. In this deed to Zimmerman the land is described as follows: "Beginning for the same at the intersection of the northeast side of Reisterstown road and the northwestern boundary or outline of the strip of ground thirty feet wide lying along and parallel with the northwest side of Belvedere avenue (sixty

feet wide) condemned by the Falls Road Electric Railway Company, and running thence with and binding along the northwest outline of said strip, north thirty-six degrees forty minutes east, and parallel with Belvedere avenue, one hundred and twenty-nine feet; thence north fifty-three degrees twenty minutes west and at right angles with Belvedere avenue, sixty-two feet and seven inches; thence thirty degrees forty minutes west and parallel with Belvedere avenue, one hundred and twenty-one feet to the northeast side of Reisterstown road; thence binding on and along with the northeast side of said road sixty-three feet to the place of beginning."

In the habendum clause of the deed is found the following reservation: "The right is hereby reserved unto said grantor, his heirs and assigns, to use as a sidewalk or footway all that portion of said lot or parcel of ground ten feet wide next adjacent to and binding on and along said Belvedere avenue and extending the full *frontage* of said lot or parcel of ground on said Belvedere avenue."

In a very short time after the purchase of the lot from Ingram, Zimmerman started the erection of his building thereon, which was completed in the summer or fall of 1907. The building, on the turnpike, extended across the entire width of the lot—that is, from the sidewalk to its northern limit, and upon the sidewalk it extended a much greater distance. Upon the first floor of the building was a storeroom occupied by the plaintiff, with entrances thereto from both the turnpike and sidewalk, and the postoffice, with its entrance upon the sidewalk. The second floor was used as a pool room and bowling alley, and the entrance to the stairway leading to it is from the sidewalk. The main entrance to the storeroom is what may be termed a corner entrance, and is at the corner of the sidewalk and the turnpike.

It is contended by the plaintiff that this building fronts on the sidewalk facing Belvedere avenue, while the defendants contend that the front of the building is on the Reisterstown turnpike, and much evidence, including photographs of the building, was offered in support of their respective

contentions. From the evidence, we are of the opinion that it was erected so as to front on both the Reisterstown turnpike and the sidewalk on Belvedere avenue, and that such was the intention of the owner in building it.

The evidence discloses that before the plaintiff built upon the lot, a drain, or what some of the witnesses called a ditch, extended along the eastward side of the turnpike from the location of the plaintiff's store to Belvedere avenue, and that after the erection of his building, the plaintiff placed tiling in the ditch and covered it over, and removed some stones that were the remnants of a fence that at one time ran parallel with the ditch and to the eastward of it. He also leveled the ground which formed the end of the right of way by hauling dirt and cinders thereon, and the letter carriers and others having business at the store of the plaintiff could and did thereafter pass over said land on foot and in vehicles in reaching the postoffice and store, and there was some testimony that vehicles were used in delivering material and other things to persons occupying buildings fronting on the sidewalk to the eastward of plaintiff's property, and that others reached the store and postoffice from Belvedere avenue by a crossing placed by the railway company over its tracks, at the request of the plaintiff, in front of the postoffice. This crossing at first, it seems, was used as a footway, but later some of the letter carriers, if not others, crossed with their vehicles. The rails upon the right of way, as well as those upon Belvedere avenue, are what are called "T" rails.

Much evidence was offered, including photographs, as to the physical appearance and condition of the ground extending from the southern limits of Belvedere avenue to the sidewalk above mentioned, including both Belvedere avenue and the right of way, and whether or not to the ordinary observer there was anything to indicate the location of the division line between Belvedere avenue and the right of way. In our opinion, the fact is established by a preponderance of evidence that there was nothing to indicate to the ordinary ob-

server any difference in the physical condition or appearance of the avenue and the right of way, or to indicate the location of the division line between them.

We here insert the plat, Plaintiff's Exhibit A, which shows the location of the lot conveyed to Zimmerman and the outlines of the building and the entrances thereto, both from the turnpike and the sidewalk, and the relative position of said lot to the Reisterstown turnpike, Belvedere avenue, the ten-foot sidewalk, the thirty-foot strip or right of way, the tracks as now laid upon Belvedere avenue and said right of way, and the lot of land upon which defendant was restrained or enjoined from erecting a building.

Plat, Plaintiff's Exhibit A, showing location of the lot conveyed to Zimmerman, the building thereon, and the strip of land adjacent thereto, abandoned by the railway, and upon which, by injunction, the defendant was enjoined from erecting a building.

The plat, however, does not show the original position of the tracks upon the right of way near the turnpike before they were deflected, but by the use of the plat the position then occupied by them may be easily understood. They extended in a straight line over and near to the eastward end of the lot upon which the bank building is sought to be erected. Nor does the plat show the buildings, stores and dwellings, etc., and there are many of them, which are upon the ten-foot sidewalk to the easteward of plaintiff's lot and which face Belvedere avenue.

With the facts as we have stated them and with the conditions existing as we have described them, the defendants, who had for a number of years resided in the immediate vicinity of the land here involved, and who were well acquainted with said facts and conditions, purchased from James E. Ingram, Sr., and wife all the lands conveyed to him by Hook and wife, except such parts of it as had been sold and conveyed to Zimmerman and others, and on the 25th day of June, 1909, Ingram and wife conveyed unto the defendants all their right, title and interest in the lands so purchased by them, and in the deed to the defendants the land thereby conveyed is described as beginning at the intersection of the northeast side of Reisterstown turnpike with the center line of Belvedere avenue, sixty feet wide, and the land described therein constituted all of the Wamsley land at the time owned by Ingram lying northward of the center line of Belvedere avenue, and therefore including the thirty-foot strip or right of way.

After acquiring the reversionary interest of Ingram in the right of way mentioned, the defendants conveyed unto the Title Guarantee and Trust Company the interest so acquired by them in all of said right of way, except in that part thereof which is described in the deed to them from the Title Guarantee and Trust Company hereafter mentioned. On the 15th day of September, 1909, the railway company released and conveyed unto the Title Guarantee and Trust Company all its

title and interest in and to that part of said right of way which is described as beginning for the same at a point where the northeast side of Reisterstown turnpike intersects the northwest right of way line of a thirty-foot strip of land lying along the northwest side of Belvedere avenue, and running thence north thirty-six degrees forty minutes east along said right of way line, a distance of seventy feet; thence south fifty-three degrees twenty minutes east, thirteen feet four inches; thence south twenty-eight degrees twenty-four minutes west, seventy-three feet three inches to the northeast side of the Reisterstown turnpike, and thence north forty-seven degrees twenty-one minutes west along the side of said turnpike, twenty-five feet to the place of beginning, the outlines of which are clearly shown upon the above mentioned plat. The consideration named in the last mentioned deed was one thousand dollars and the conveyance to the grantor of the reversionary interest of the grantee in that part of said right of way which was conveyed to the grantor by the defendants.

On the 23rd day of November, 1909, the Title Guarantee and Trust Company conveyed unto the defendants the interest it had acquired from the United Railways Company in the land described in the aforesaid deed of September 15th, 1909, at and for the sum of five dollars and other good and valuable consideration.

Why the Title Guarantee and Trust Company was used by the defendants in these proceedings as a medium of conveyance is not shown or explained. The defendant Russell in his testimony stated that the negotiations for this lot commenced shortly after Zimmerman purchased his lot, and that the negotiations therefor with the United Railways and Electric Company were almost wholly conducted by him, although the title thereto was not transferred until September 15th, 1909, and at which time the title was conveyed to the Title Guarantee and Trust Company.

Under the aforesaid deeds from Ingram and wife and the Title Guarantee and Trust Company the defendants claim

the absolute fee in the lot conveyed. The defendants were about to improve the lot by the erection of a bank building thereon when the bill in this case was filed. The bill prayed for an injunction restraining them from obstructing in any manner that portion of the right of way described in the deed to them from the Title Guarantee and Trust Company "where the same abuts upon the land of the said T. Irvin Zimmerman or any part thereof, and from erecting any building or buildings, fence or fences, structure or structures of any kind whatsoever thereon."

An answer and replication were filed and a great mass of testimony was taken.

Although there are other facts alleged in the bill in addition to those that we have very fully stated, we do not think it necessary to refer to them in the view we take of this case.

All the land mentioned in these proceedings at one time belonged to Mary J. Wamsley, and while it was so owned by her the railway company acquired its rights in said strip of land by condemnation proceedings. Mrs. Wamsley, however, held thereafter a reversionary interest therein. In the condemnation proceedings there is found filed with the inquisition of the jury, to be considered with it, an agreement between the Falls Road Electric Railway Company and Mary J. Wamsley and John S. Wamsley, her husband. This agreement reads:

"The Falls Road Electric Railway Company agrees to construct and maintain suitable crossing over its tracks to each dwelling which may be erected on the property of Mary J. Wamsley, fronting on the said railway, and in addition thereto to maintain and construct at such points and places where a road, avenue or street may be laid off on the property of the said Mary J. Wamsley leading to the north side of the railway constructed along Belvedere avenue, the crossings to be one or two to each dwelling house, as may be required by the owner. This obligation is also made *for the benefit of Mary J. Wamsley, her heirs or as-*

*signs,* and the parties hereto agree that the Circuit
Court for Baltimore County shall ratify and confirm
the inquisition in the above entitled case, with the un-
derstanding that the above agreement shall be taken *to
constitute a part of said inquisition as much as if the
same had been incorporated therein."*

This inquisition was finally ratified, the order being as
follows:

"No cause to the contrary appearing, it is, this 31st
day of July, 1897, ordered that the within inquisition
be confirmed *in accordance with the agreement filed in
the case."*

This agreement, in our opinion, is an important factor in
determining the rights of the parties involved in these pro-
ceedings. The tract of land so owned by Mrs. Wamsley at
the time of the institution of the condemnation proceedings,
contained about eight acres and was situated at the inter-
section of Belvedere avenue and the Reisterstown turnpike,
lying immediately north of the avenue and east of the turn-
pike. The strip of land sought to be condemned, thirty feet
wide, formed the southern portion of this lot of land, and with
it condemned, no part of her land would abut on Belvedere
avenue, but would be separated therefrom by the land so con-
demned.

At this time the said land of Mrs. Wamsley was vacant,
in the sense that it had not been built upon, but it was her
purpose to develop it by dividing it into lots and selling
them to persons to erect buildings thereon. Many of these
lots were to face upon Belvedere avenue with no means of
ingress and egress, to and from them, other than a sidewalk
in front and an alley in the rear of them, and it was very
natural that she should wish to make some provision by which
she and her assigns, owners of buildings upon the lots front-
ing or facing Belvedere avenue, should have access to Bel-
vedere avenue by crossing this strip of land, and it is mani-

fest that this agreement was made in order that this right should be reserved to her and those claiming by, from or under her.

The right of Mrs. Wamsley and her assigns, for the benefit of whom the agreement was made, as expressly stated in it, to use said strip of land in reaching Belvedere avenue, was undoubtedly conferred upon them by the requirement imposed upon the railway company of constructing and maintaining said crossings over its tracks. The right to cross said right of way in reaching Belvedere avenue was, by said agreement, conferred upon or reserved to such persons, and the agreement can not be read without reaching this conclusion. This being the meaning and effect of the agreement, then the railway company will not be permitted to place upon the right of way any obstructions that would abridge or interfere with the exercise of such right.

In this case the interest of the railway company in the right of way was not acquired by deed, but by condemnation proceedings, and the inquisition takes the place and has the full effect of a deed in conveying to the railway company the interest and estate acquired by such proceedings, subject to the terms and conditions imposed by the agreement, which was, by its provisions, to be considered a part of such inquisition, and which was so considered and treated by the Court in confirming the inquisition.

In the case of *Pennsylvania R. R. Co.* v. *Reichert,* 58 Md. 272, it is stated: "It is well settled that it is the duty of the jury, in condemnation proceedings, to award compensation to the land owner in money, and that they have no power to impose terms and conditions upon the condemning party without its consent; it is equally well settled that where such terms and conditions are prescribed in the inquisition, enter into the estimate of damages and are assented to by the parties, they are binding and constitute a contract between them." And in *Mills on Eminent Domain,* sec. 112, which was approvingly cited by the Court in that case, it is said by the author: "Compensation is ordinarily to be made in

money, yet reservations of rights to owners are favored and the condemning parties may ratify an award a part of which requires improvements to be made for the benefit of the owner. The reservation of rights to the owner is only carrying out the spirit of the law that the public improvement shall be made with the least damage to private individuals."

In this case, however, the counsel for the appellants contends that the reservation here claimed is not a part of the inquisition, and therefore should not have the effect sought to be given it.

In the body of the agreement it is specially agreed between the parties thereto that "the Circuit Court for Baltimore County shall ratify and confirm the inquisition in the above entitled case, with the understanding that the above agreement shall be taken *to constitute a part of said inquisition as much as if the same had been incorporated therein*," and the agreement was filed with the inquisition and was confirmed "in accordance with the agreement filed in the case."

It was not only asked by the parties that it be considered as a part of the inquisition with which it was filed, but the Court so considered and treated it and confirmed the inquisition as embodying said agreement. Even should it be held that the agreement formed no part of the inquisition, both parties to the original agreement and those claiming under them or either of them, by reason of its express terms, upon which the Court acted in confirming the inquisition, are now estopped from denying that such agreement forms a part of the inquisition. It was filed with, and at the time, the inquisition was filed, and it is fair to assume that the jury at the time had knowledge of it and that it was considered by them in estimating the damages allowed to the owner of the land. But as was said by JUDGE BURKE in his opinion delivered in the lower Court, "Whether the agreement be treated a part of the inquisition or not, it was certainly binding on all persons who had knowledge or notice of it, and the defendants upon the facts in evidence are chargeable with notice of this agreement." In addition to other facts and circum-

stances indicating knowledge on their part of the said agreement, it is specially referred to in the deed to them from the Title Guarantee and Trust Company.

The agreement was binding upon the parties to the agreement, and the rights conferred or reserved thereby enured to the benefit of all persons claiming through or under the Wamsleys and the provisions of said agreement could not be violated either by the Wamsleys or their grantees, or by the company or its grantees, and a Court of Equity has power to restrain any of them who may attempt to violate it.

As was said by JUDGE BURKE, this case in our opinion is governed by the principles laid down in *Newbold* v. *Peabody Heights Co.,* 70 Md. 493. There it was held, that if the covenant, although not one running with the land, "be of a character to create a right and an equity in favor of the vendor or lessor, and those claiming in his right, as against those holding and occupying the land, a Court of Equity will assume jurisdiction and administer relief. This relief may be furnished either by way of injunction or upon application for specific performance, according to the circumstances of the case calling for the exercise of equitable jurisdiction."

It is, however, contended by the counsel for the appellants that if these principles be applicable to a case of this character, nevertheless the appellee is not, upon the facts of this case, entitled to the relief sought by him, inasmuch as the property of the plaintiff, as they allege, does not front on the railway and is not a dwelling.

We have already expressed ourselves as being of the opinion, upon the evidence offered, that the building fronts on the railway. It is true, no part of the building, as now used, is a dwelling, but because of this fact should the defendants be permitted to place in front of this property a substantial and permanent obstruction, depriving the plaintiff of the right to cross said street at the point where such obstruction is to be placed? The construction placed upon this agreement by the defendant is, in our opinion, too narrow.

By the agreement the benefits of it were to enure to Mrs. Wamsley and to all of her assigns, and in our opinion it was not intended by the agreement, nor should it be so construed, as being a right accruing to dwelling house properties alone, but to all properties, whether business places or dwelling houses, that front upon said right of way, even should it be determined that it was only in front of the dwellings that it was encumbent upon the company to construct and maintain crossings. A distinction favorable to dwelling houses cannot be based upon sound reasoning, for the necessity of the exercise of this property right in respect to buildings used and occupied as business places, exists to the same, if not to a greater, extent than it does in cases of dwelling house property.

The erection of the building upon that part of the right of way separating the plaintiff's property from Belvedere avenue, not even to be used for the purposes—of a railway company—would, in our opinion, be an unauthorized obstruction thereon, in violation of the terms of the agreement and inconsistent with its purposes, in so far as it deprives the plaintiff of his property-right acquired thereunder to cross said right of way in front of his building in reaching Belvedere avenue. The erection of the proposed building, under the facts and conditions disclosed by the record, would, we think, be a violation of the plaintiff's property-rights and would result in injury to him.

The plaintiff is entitled to the relief sought and the decree of the Court below will be affirmed.

*Decree affirmed with costs to the appellee.*